# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **KEVIN M. TODD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No: 10 C 4673** |
| v. ) | |
| ) | **Magistrate Judge Jeffrey Cole** |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Kevin Todd, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Todd asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. Todd applied for DIB and SSI in February 2007, alleging that he became disabled on January 29, 2007 due to cirrhosis of the liver. (Administrative Record ("R.") 140, 144, 162). His application was denied initially and upon reconsideration. (R. 68, 77). After requesting a hearing on his claim, Mr. Todd – represented by counsel – appeared and testified before an administrative law judge ("ALJ") on February 9, 2009. (R. 47-64). In addition, Dr. Carl Lee testified as a medical expert and Thomas Dunleavy

testified as a vocational expert. (R. 57-64). The hearing was continued so that Mr. Todd could undergo a consultative examination. (R. 62-63).

On July 1, 2009, Mr. Todd was back in front of the ALJ, along with his attorney. Mr. Todd and another vocational expert, Grace Gianforte, testified. (R. 23-46). On July 23, 2009, the ALJ issued a decision finding that Mr. Todd was not disabled because he retained the capacity to perform a substantial range of unskilled, light work, which allowed him to do jobs that exist in significant numbers in the national economy. (R.10-22). This became the final decision of the Commissioner when the Appeals Council denied Mr. Todd' request for review of the decision on May 25, 2010. (R. 1-4). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Todd has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## EVIDENCE OF RECORD

### A.

### The Vocational Evidence

Mr. Todd was born on December 3, 1956, making him fifty-two years old at the time of the ALJ's decision. (R. 142).

### B.

### The Medical Evidence

Nearly all of the medical evidence in this case comes from about ten days in early 2007. Mr. Todd wasn't feeling well at the end of January 2007. He felt tired and

weak and was experiencing shortness of breath. His stomach was bloated and he had pain there. (R. 251). He checked himself into the hospital January 29th.

At that time, Mr. Todd was in the habit of drinking eight to ten vodkas a day, every day, for years. (R. 251, 361).[1] His liver enzymes were elevated (R. 252), and the left lobe of the liver appeared to be markedly enlarged. (254). Ascites was present in the abdomen. (R. 257). There was also some pleural effusion. (R. 257). Doctors drained 70-100 cc's of fluid from his abdomen. (R. 251). They also performed thoracentesis to drain fluid from the right lung. (R. 262). Their diagnosis was alcoholism and alcoholic cirrhosis. (R. 255). Mr. Todd was discharged on a low salt and low protein diet, and given a course of rehabilitative exercises. (R. 334-35). He had a normal range of motion in his upper extremities, and his grip strength was 4/5 bilaterally. (R. 297). Doctors advised him to give up all alcohol or his prognosis was not good. (R. 263).

Mr. Todd had a consultative examination with Dr. M.S. Patil on May 14, 2007. At the time, Mr. Todd's only complaints were occasional cramping in his fingers and toes and some numbness in his toes. (R. 468). Physical examination was essentially normal. There was moderate hepatomegaly but no tenderness. (R. 469). Range of motion was normal in the back and the extremities. (R. 469). Motor strength was 5/5 in all extremities. (R. 469). Reflexes and sensation were normal. (R. 469). Grip strength was 5/5 bilaterally, and Mr. Todd was able to perform examples of fine and gross manipulation with no difficulty. (R. 470). Blood level testing was within normal limits,

---

[1] One physician referred to Mr. Todd's regimen as including eight *pints* of vodka every day; in other words, a gallon. (R. 271). It's unclear if this was an error as throughout the remainder of the medical records it is said that Mr. Todd has eight drinks a day.

3

– including creatinine, albumin, etc. – with the exception of elevated glucose at 115. (R. 472).

After his hospitalization, Mr. Todd followed up with Dr. Benjamin Schmid at the Hammond Clinic. On July 3, 2007, an x-ray revealed mild to moderate, multilevel degenerative disc disease in Mr. Todd's cervical spine. (R. 486). Blood levels were all normal, including glucose, with the exception of alkaline phosphates. (R. 492).

On July 30, 2007, Mr. Todd sought treatment at the Hammond Clinic for numbness in his fingers and toes. He said he had difficulty squeezing and opening his hands. (R. 485). It got better in the afternoon. (R. 485). He had no back pain or any problems other than in his hands and feet. (R. 485).

Dr. Kevin Joyce's treatment notes from October 10, 2007, referenced bilateral flexion contractures of the fingers, which were worse on the right. (R. 537). There was no tenderness in Mr. Todd's hands, but palpation revealed palmar nodules consistent with fibrosis. (R. 538). X-rays revealed flexion deformities and mild degenerative changes in the first carpal metacarpal joints, and an EMG showed evidence of neuropathy in the right wrist. (R. 538). Dr. Joyce thought Mr. Todd's hand impairment was closely related to Dupuytren's contractures and due to his alcoholic cirrhosis. (R. 539).

On November 28, 2007, Dr. Joyce filled out a form provided by Mr. Todd's attorney. (R. 510-11). Under "signs or symptoms . . . that affect wrists, hands or fingers", the doctor checked off "limitation of motion" and "reduced grip strength." (R. 510). There was no pain or paresthesia. (R. 510). Dr. Joyce also said that Mr. Todd's ability to use his hands to grasp, turn and twist objects was about 50% of normal, and his ability to perform fine manipulations was about 10% of normal. (R. 511).

4

On December 17, 2007, Dr. Schmid filled out a similar form on Mr. Todd's cirrhosis. He noted a diagnosis of palmar fibrosis. (R. 513). Under "signs and symptoms", the doctor checked off ecchymoticlesions, pleural effusion, hot/cold spells, splenomegaly, chronic fatigue, ascites, spider nevi, peripheral edema. (R. 513). Under the tests he had performed, Dr. Schmid listed "CT scan – [illegible] of liver." (R. 513). Dr. Schmid said Mr. Todd had not used alcohol since January 2007, but abstinence would have no effect on his symptoms. He'd continue to experience problems with his hands due to "palmar fasciitis [illegible] by Dr. Joyce will continue to prevent complete finger closure of both hands." (R. 514). Dr. Schmid then indicated that Mr. Todd's symptoms would have no effect at all – not even rarely – on his attention and concentration. (R. 514). Still, he would be unable to perform routine, repetitive tasks; detailed or complicated tasks; fast paced tasks; or be exposed to workplace hazards. (R. 514).

There were no side effects from medication. (R. 514). Mr. Todd could walk six blocks without rest or severe pain, sit for just one hour at a time, and stand for just 20 minutes at a time. (R. 515). While Dr. Schmid indicated that Mr. Todd would not have to lie down during the day, he also said that in eight hours, he could only sit for a total of four hours and stand/walk for a total of two hours. (R. 515). The doctor added that Mr. Todd would have to take four unscheduled breaks of 20 minutes apiece every day. (R. 515). This was due to "pain/paresthesia, weakness, chronic fatigue." (R. 515). He would also be absent four time a month. (R. 516). The most Mr. Todd could lift was 20 pounds, but only rarely. (R. 515).

Back at Dr. Schmid's office, Mr. Todd complained of an ache in his right third finger on June 17, 2008. He also experienced right-side neck pain at times. (R. 525).

On March 12, 2009, Mr. Todd had a consultative examination with Dr. James Elmes. The doctor noted finger stiffness: Mr. Todd buttoned, unbuttoned, and worked a zipper slowly. (R. 612). He was able to write half a page before tiring. (R. 612). He could turn a doorknob, key a lock, and pick up a penny without difficulty. (R. 612). Grip strength on the right ranged between 17 and 28 pounds; on the left, between 16 and 18 pounds. (R. 612). These reading were 4/5 of normal. (R. 613). Mr. Todd's neck was tender at the C5-6 level and in the right tapezius area. (R. 613). Range of motion was mildly diminished. (R. 613). Dr. Elmes thought Mr. Todd could frequently lift/carry 20 pounds, and occasionally lift/carry up to 40 pounds. (R. 615). He could sit for four hours at one time and stand/walk for four hours at a time. (R. 616). He could use his hands to handle, finger, and feel a third of the day. (R. 617).

## C.

## The Administrative Hearing Testimony

### 1.

### The Plaintiff's Testimony

At the first hearing, Mr. Todd told the ALJ about the problems he had closing his hands, which was especially due to his middle fingers. (R. 63). The problems started after he got out of the hospital in February 2007. (R. 63). He was able to drive, however, because he loosens his hands up by soaking them in warm water in the morning. (R. 63). They also improved the more he used them. (R. 63). Damp weather made them worse. (R. 63). When the ALJ noted that a medical examination about three months after Mr.

6

Todd left the hospital demonstrated that there was essentially nothing wrong with his grip strength or manipulation, Mr. Todd corrected himself and said his condition got worse after that examination. (R. 54). Then, he adjusted once more and said it got bad in the beginning of 2008, a year after he got out of the hospital. (R. 54).

Mr. Todd's experience in the hospital – it was the first time he had ever been hospitalized – convinced him stop drinking. (R. 56-57). He doesn't go to AA, but has the support of his large family. (R. 57).

Mr. Todd testified that he had no problems with walking, that he could walk two blocks, but also that the tips of the toes on his left foot were numb. (R. 56). Due to the trouble with his hands, it was difficult to do things like zip and unzip a zipper. (R. 57).[2] After listening to Mr. Todd's allegations, the medical expert testified.

At the second hearing, Mr. Todd testified that he could close his right hand – he's right-handed – all the way, but not his left hand. (R. 27). He could only open both hands "so far." (R. 27). He was able to write, but not for very long. (R. 28). Mr. Todd added that he had a hard time walking or standing for very long. (R. 28). He could only stand for a half hour. (R. 28). Then he would have to sit for fifteen minutes before he could stand up again. (R. 29).

Mr. Todd said he lived with his 87-year-old mother. (R. 30-31). He testified that he had to do most if not all the work around the house. (R. 31). He cut the lawn, but had to take one fifteen minute break during the chore because his hands would stiff up from being in one position. (R. 31, 32). He pulled weeds, but did have a hard time gripping them. (R. 31). He drove his mother around and made the beds. (R. 31).

---

[2] At the close of Mr. Todd's testimony, the medical expert testified that any neuropathy was due to alcoholic, rather diabetic, neuropathy. (R. 61).

Mr. Todd also said he experienced pain in his neck that was "like a numbing feeling." (R. 32). He didn't have it all the time and there were days that he didn't have it at all. (R. 32). It also occurred when he mowed the lawn. (R. 32). He avoided pain medication because he was afraid it would adversely affect his liver. (R. 33). He thought he could write about a paragraph before his hands locked up. (R. 34). He said he couldn't pick up a coin or anything small with his left hand, but he could pick up larger objects. (R. 34). Mr. Todd explained that he began to feel pain in his neck when he was lifting something to chest level. (R. 35).

## 2.

### The Vocational Expert's Testimony

Grace Gianforte then testified as a vocational expert. She classified Mr. Todd's past work as a maintenance man was medium, skilled work. (R. 39). His bartender job was light and semi-skilled. (R. 39). The ALJ asked the VE to assume a person were limited to light work, with only occasional manipulating and gripping. (R. 39). The VE said that occasional gripping and manipulating was an adverse vocational factor because 98% of all occupations require more than occasional gripping and manipulating. (R. 39). Nevertheless, such a person could work as a light security clerk or information clerk. (R. 39). There were 3500 security clerk jobs in the regional economy and 4000 information clerk positions. (R. 39). The VE said Mr. Todd's experience as a bartender gave him customer service skills that would transfer to the clerk positions. (R. 40). These jobs involved only occasional writing: taking a message, writing a note, documenting an occurrence. (R. 41). If a person were off task ten to fifteen minutes three times a day

due to symptoms from their impairments, that was an adverse factor. (R. 41-42). Such a person would require a supportive work environment. (R. 44).

**D.**

**The ALJ's Decision**

The ALJ found that Mr. Todd suffered from the following severe impairments: "diabetes and residuals of alcoholism, including some hand grip limitations (alcoholic or diabetic neuropathy." (R. 12). The ALJ further found that Mr. Todd's degenerative disc disease in his neck was not a severe impairment, because he does not allege that it causes any limitation in his ability to perform work activities. (R. 12). The ALJ reviewed the medical evidence concerning Mr. Todd's impairments and determined that he did not have an impairment or combination of impairments that met or equaled a listed impairment. (R. 13). He specifically considered listing 5.05, covering chronic liver disease and 11.14, covering peripheral neuropathy. (R. 13).

Next, the ALJ determined that Mr. Todd could perform light work as long as it involved only occasional fine finger manipulation. (R. 13). Under the regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b); 416.967(b).

He reviewed Mr. Todd's testimony, especially his allegations that he had difficulty opening and closing his hands or walking more than two blocks. (R. 14). The

9

ALJ also note that Mr. Todd said he lived with his elderly mother and performed all the necessary household chores at her home, including yardwork. (R. 14). He did these activities without pain medication. (R. 16). He also referenced Mr. Todd's statement that his hands were tight in the mornings, but improved after he soaked them in warm water. (R. 14). The ALJ found that Mr. Todd's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [were] not credible to the extent they [were] inconsistent with [his] residual functional capacity assessment." (R. 14).

The ALJ also noted medical evidence – Dr. Patil's consultative examination – documenting Mr. Todd as having normal grip strength and manipulative abilities. (R. 14). He also credited the findings of Dr. Elmes noting only mild to moderate limitations on grip strength and manipulations. (R. 16). The ALJ did not assign any weight to the findings of Dr. Joyce because they were not supported by any analysis or observations. (R. 14-15). Similarly, the ALJ rejected Dr. Schmid's findings as merely checked boxes on a form without substantiation in the record. (R. 15). Moreover, some of the limitations he found had no connection to Mr. Todd's hand problems. (R. 15).

The ALJ determined that Mr. Todd could not perform his past work but, relying on the VE's testimony, concluded that Mr. Todd could perform jobs existing in significant numbers in the regional economy. (R. 17). To reach this conclusion, the ALJ determined that Mr. Todd had customer service skills from his long experience as a bartender that were transferable to other occupations like security clerk and information clerk. (R. 17). As a result, he concluded that Mr. Todd was not disabled. (R. 18).

IV.

DISCUSSION

A.

**The Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his

11

discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

### B.
### The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden

shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

Key among Mr. Todd's problems with the ALJ's opinion, is the ALJ's treatment of opinions from Mr. Todd's treating physicians, Drs. Joyce and Schmid. As this requires the case to be remanded, we need not reach the remaining issues raised by Mr. Todd. An ALJ is required to provide a certain level of analysis if she rejects opinions of treating or examining physicians. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt*, 496 F.3d at 842; *White v. Barnhart,* 415 F.3d 654, 658 (7th Cir.2005). This rule takes into account the treating physician's advantage in having personally examined the claimant and developed a rapport, while controlling for the biases that a treating physician may develop, such as friendship with the patient. *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir. 2006); *Dixon,* 270 F.3d at 1177.

In deciding how much weight to accord a treating physician's opinion, the ALJ should consider various factors, like how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth; consistency with the record and support are rolled back into the equation as well. *Id.* at 377; 20 C.F.R. § 404.1527(d). Simply put, if an ALJ does not give the treating physician's opinion controlling weight, she has to provide "good reasons" for how much weight she accords it. *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010);

13

*Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An examining physician's opinion is entitled to less weight that a treating physician's, but an ALJ still can't reject it out of hand. She has to determine the weight she decides to accord it and must explain her reasoning. *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). And those reasons must be supported by the record. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Here, the ALJ rejected Dr. Joyce's findings, made in cursory fashion on a form supplied by Mr. Todd's attorney, because [he] did not substantiate [his] calculations with any written analysis or observations . . . ." (R. 15). The ALJ felt similarly about Dr. Schmid's findings, saying he "did not substantiate [his] opinions with notations in the record, but simply checked boxes in a form presumably provided by [Mr. Todd's] attorney." (R. 15). This is a valid reason for rejecting the doctors' opinions – such opinions must be supported by medical signs and laboratory findings. 20 C.F.R. § 404.1527(d)(2)[3]; *Simila v. Astrue*, 573 F.3d 503, 514 (7th Cir. 2009); *Skarbek v. Barnhart,* 390 F.3d 500, 503 (7th Cir.2004). Standing alone, the forms from Dr. Joyce and Dr.

---

[3] The Commissioner's regulations explain the need for supporting treatment notes as foollows:

> The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions. We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

20 C.F.R. §404.1527(d)(3).

14

Schmid are all but useless. They are utterly devoid of *any* signs, findings, or explanations. But they do not stand alone.

Dr. Joyce submitted his treatment notes from October 10, 2007, in which he discussed Mr. Todd's bilateral flexion contractures of the fingers and palmar nodules consistent with fibrosis. (R. 538). He provided X-ray evidence of mild degenerative changes in the first carpal metacarpal joints, and EMG results showing evidence of neuropathy in the right wrist. (R. 538). The ALJ made no reference to these treatment notes, focusing instead on the form. (R. 14-15).

An ALJ can't simply ignore a line of evidence that is contrary to his conclusion. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009); *Villano v. Astrue,* 556 F.3d 558, 563 (7th Cir.2009). In this case, there is no way to tell if the ALJ even saw Dr. Joyce's treatment notes. If he did, either he's wrong that Dr. Joyce failed to support his opinion with any medical evidence, or he should have explained how Dr. Joyce's examination of Mr. Todd's hands and x-rays and an EMG are inadequate.

The Commissioner argues that even if the ALJ had credited Dr. Joyce's findings, they would not have been inconsistent with the ALJ's determination that Mr. Todd could perform occasional fine manipulation. The Commissioner submits that the Department of Labor, Selected Characteristics of Occupations Defined in the Dictionary of Occupational Titles ("SCDOT"), defines "occasionally" as up to one-third of the workday, *see Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008), and Dr. Joyce's finding that Mr. Todd is limited to fine manipulation 10% of the day falls under that definition. Reasoning like that might qualify as building a logical bridge between the evidence and an ALJ's conclusions, were it found in the ALJ's opinion. But it is not.

Review of the ALJ's opinion is confined to the rationale offered by the ALJ; a court does not review the reasoning provided by the Commissioner's attorneys, however logical it may be. *See SEC v. Chenery Corp.,* 318 U.S. 80, 93–95 (1943); *Scott v. Astrue,* 647 F.3d 734, 739 (7th Cir.2011).

The ALJ's neglect of Dr. Joyce's treatment notes is enough to warrant a remand in this case, but the ALJ also fell a little short in his consideration of Dr. Schmid's opinion. As already noted, the ALJ also rejected Dr. Schmid's findings as unsupported by clinical notes. Again, the ALJ made no reference to the treatment notes Dr. Schmid provided for the record. Unlike Dr. Joyce's notes, however, Dr. Schmid's notes don't substantiate his opinion. Mr. Todd points to a series of jottings in which Dr. Schmid noted that Mr. Todd had no joint pain or edema (R. 448), that he said he couldn't flex his fingers or complained of stiffness in his fingers (R. 486, 519), that x-rays revealed mild to moderate degenerative disc disease (R. 488-90, 506), that an ultrasound of his liver revealed subtle findings indicating cirrhosis (R. 522), or finger contractures. (R. 532). Dr. Schmid did little more than take note of Mr. Todd's complaints about his hands, and left the examination and diagnosis to Dr. Joyce. (R. 514). *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008)(ALJ may discount opinion based solely on patient's complaints). There is nothing to indicate why Mr. Todd would be so severely limited in his ability to walk, stand, and sit. Perhaps the reason the ALJ didn't specifically refer to the notes Mr. Todd cited in his brief is because he thought it was self-evident. It is not, at least not to judges, who are repeatedly cautioned not to play doctor. *Turner v. Astrue*, 390 Fed.Appx. 581, 584 (7th Cir. 2010). Some path of reasoning between the notes and his assessment of the doctor's opinion is required. *See Jones v. Astrue,* 623 F.3d 1155,

16

1160 (7th Cir.2010)(ALJ must logically connect the evidence to his conclusions to allow for a meaningful review).

## CONCLUSION

The plaintiff's motion for summary judgment or remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED:_____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 7-30-12